# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **CLYDE MATTHEW TROSCLAIR** | **CIVIL ACTION** |
| **VERSUS** | **NO.  12-2958** |
| **N. BURL CAIN** | **SECTION "E"(2)** |

## REPORT AND RECOMMENDATION

This matter was referred to a United States Magistrate Judge to conduct hearings, including an evidentiary hearing, if necessary, and to submit proposed findings and recommendations for disposition pursuant to 28 U.S.C. §§ 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases.  Upon review of the entire record, I have determined that a federal evidentiary hearing is unnecessary.  <u>See</u> 28 U.S.C. § 2254(e)(2).[1]  For the following reasons, I recommend that the instant petition for habeas corpus relief be **DENIED** and **DISMISSED WITH PREJUDICE**.

---

[1]Under 28 U.S.C. § 2254(e)(2), whether to hold an evidentiary hearing is a statutorily mandated determination.  Section 2254(e)(2) authorizes the district court to hold an evidentiary hearing only when the petitioner has shown either that the claim relies on a new, retroactive rule of constitutional law that was previously unavailable, 28 U.S.C. § 2254(e)(2)(A)(i), or the claim relies on a factual basis that could not have been previously discovered by exercise of due diligence, 28 U.S.C. § 2254(e)(2)(A)(ii); and the facts underlying the claim show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have convicted the petitioner. 28 U.S.C. § 2254(e)(2)(B).

## I.     STATE COURT PROCEDURAL BACKGROUND

The petitioner, Clyde Matthew Trosclair, is currently incarcerated in the Louisiana State Penitentiary in Angola, Louisiana.[2]   Trosclair was indicted by a grand jury in Terrebonne Parish on August 30, 2007, on charges of first degree murder and attempted murder.[3]   He entered a not guilty plea on September 22, 2007.[4]   The Louisiana First Circuit Court of Appeal summarized the facts of the case as follows:

> On July 13, 2007, defendant arrived at the Dulac residence of Timmy Collins, a close friend.  Defendant had obtained the day off from his job offshore. Although the exact time is not clear from the record, defendant arrived at Collins's residence during daylight, and the two began drinking beer.  The two discussed going to the Uptown Sports Club in Houma to play pool later and perhaps celebrate the birthday of another friend. Mitchell Carrere and his girlfriend arrived at Collins's residence and the group visited.
>
> Sometime after 7:00 p.m., Linzie Smith, defendant's girlfriend, and Vivian Verret, Collins's girlfriend, met the men at the Chevron Jubilee, where Collins and defendant were buying beer.  The entire group then went to the residence of Mitchell Carrere's girlfriend, Jordan, where they continued visiting.  Defendant and Collins left for an undetermined amount of time but returned after dark.
>
> When Collins and defendant returned, they and Verret and Smith got into defendant's truck and traveled to the Uptown Sports Club in Houma.  The group sat at a table, drinking, as they waited for a pool table to use. At some point, Verret and Smith walked to the bathroom together.  As Verret passed Johnny Honeycutt, he grabbed her and said something offensive to her.  Honeycutt also attempted to follow Verret into the bathroom.  When Verret and Smith returned to their table, Verret told Collins about Honeycutt's actions.
>
> Collins indicated he wanted to see Honeycutt's behavior for himself, so he told Verret to walk near Honeycutt again.  Verret did so, and Honeycutt again grabbed her and said something inappropriate to her. At that point, Collins

---

[2]Rec. Doc. No. 1.

[3]St. Rec. Vol. 1 of 4, pp. 1 and 9.

[4]Id. at p. 14.

approached Honeycutt and told him to leave Verret alone. Undeterred, Honeycutt cursed at Collins and pushed him backward, causing Collins to fall and slide underneath a pool table. Before Collins could get up and retaliate, a bouncer for the bar grabbed him and threw him out.

After Collins was thrown out of the Uptown Sports Club, defendant, Verret, and Smith went outside and everyone got back into defendant's truck with Collins driving, because defendant was "a little tipsy." Collins's initial statement to the police and Verret's trial testimony indicated that Honeycutt and others followed them in a vehicle after Collins was thrown out of the Uptown Sports Club. However, defendant provided no such testimony, but instead testified that Collins wanted to go straight to his home after being thrown out of the club.

Collins drove defendant's truck back to his own residence in Dulac. This was an estimated thirty to forty-minute drive from downtown Houma. Once at Collins's residence, Collins retrieved a nine millimeter handgun, loaded it, and tried to give it to defendant. Defendant refused to take the gun, so Collins took the gun to the defendant's truck and placed it under the center console.

The group decided to return to downtown Houma with Collins driving the truck. Defendant sat in the front passenger seat and Verret and Smith sat in the back passenger seat. Smith testified she asked to go home, but instead Collins drove back to the Uptown Sports Club. According to Smith, Collins was denied entry into the club because of his earlier altercation with Honeycutt. Smith tried to convince the group to return home, but Collins drove to another bar in Houma, the Post Office Club.

Smith testified that Collins was looking for Honeycutt and eventually found him walking on a sidewalk near the Post Office Club. Collins slowly drove the truck alongside the sidewalk, and Verret yelled something out of the window at Honeycutt. Samuel Pugh, Jr., also known as "Kilo," approached the [passenger's] side of the truck and challenged defendant to exit the truck. At that time, Honeycutt walked up to the driver's side, recognized Collins from the earlier altercation and struck him several times in the face. Defendant grabbed the gun from the console and fired two shots. Collins immediately drove the truck away, and by his own admission, ran red lights and stop signs while fleeing the scene. Defendant threw the gun into the water from an overpass.

Collins drove the truck to a Wal-Mart parking lot, and he and Verret exited the truck and called his mother to come and get them. Defendant claimed he later went to Collins's residence for a short time before leaving for work in Berwick early in the morning. Defendant was later told by his boss that he was wanted for questioning in connection with the incident, and defendant returned to Houma to turn himself in to authorities. Before defendant could reach the police station, he was apprehended by law enforcement officers.

3

The two shots defendant fired struck two different people.  One shot struck Honeycutt and severed his aorta and windpipe, causing Honeycutt's death in a matter of seconds.  The other shot struck Samuel Pugh, Sr., Kilo's father, who was standing some distance away, watching the incident.  Pugh, Sr. was taken to the hospital, and was treated and released that same night.

Collins testified that he did not realize the shots were fired from the truck he was driving, but thought the shot was fired at the truck. Despite this impression, no one from the vehicle Collins was driving contacted the police. Collins testified he was struck in the face two to three times before the shots were fired, and he did not realize Honeycutt had fallen away from the truck when he drove away.  Collins also testified he had no recollection of how Honeycutt was shot because he had "blacked out" due to his consumption of alcohol and pills.

Defendant testified at trial and described how he had consumed alcohol and pills (Xanibars) for several hours prior to first arriving at the Uptown Sports Club. While there, defendant claimed to have consumed at least one whiskey on the rocks and three to four shots of whiskey.

Defendant acknowledged that when Collins saw Honeycutt on the sidewalk upon their return to downtown Houma, Collins wanted to fight Honeycutt.  Defendant testified that when Kilo and Honeycutt approached the truck, he was scared and he felt as if the truck were surrounded. According to defendant, Collins was seated in the driver's seat with the seat reclined, so when Honeycutt began punching him, Collins could not defend himself. Defendant testified he grabbed the gun, pointed it out of the window, and fired in an attempt to scare people away.

Defendant testified that as the vehicle sped away, he was drifting in and out of sleep due to his intoxicated condition; however, he admitted to throwing the gun away because he "didn't want to [go] to jail." At no time did defendant contact the police.

The prosecution introduced a surveillance video reflecting the entire incident. In the video, a truck, identified as the truck driven by Collins, slowly moves along the street outside the Post Office Club. The truck comes to a stop and two individuals, identified as Honeycutt and Kilo, approach the truck.  Within two seconds Honeycutt leans into the truck and throws a punch toward Collins. A white flash appears, Honeycutt falls away from the truck, and the truck speeds away.  A total of four seconds elapse from the time Honeycutt approaches the truck until the time the flash appears.

All of the witnesses who testified indicated they never saw Honeycutt with a weapon.

4

State v. Trosclair, 2010 WL 1253375, at *1-3 (La. App. 1st Cir. 4/1/10); State Record Volume 3 of 4, Louisiana Fifth Circuit Court of Appeal Opinion, No. 2009-KA-2002, pages 2-3, April 1, 2010.

Trosclair's trial commenced on November 3, 2008, were continued until November 5, 2008, and on November 6, 2008, the jury returned a verdict of not guilty on the charge of attempted murder and guilty on the charge of second degree murder.[5] At a hearing on December 4, 2008, the state trial court denied Trosclair's motion for a new trial and motion for post-verdict judgment of acquittal, and counsel waived legal delays for sentencing.[6]  On December 5, 2008, the state trial court sentenced Trosclair to life in prison at hard labor without benefit of parole, probation or suspension of sentence.[7]

On direct appeal to the Louisiana First Circuit, Trosclair's appointed counsel alleged two errors:[8]  (1) There was insufficient evidence to support Trosclair's conviction.  (2) Trosclair lacked specific intent and therefore should only have been convicted of the lesser included offense of manslaughter.  On April 1, 2010, the

---

[5]Id. at pp. 244-48; 253-59; 261-63.

[6]Id. at p. 267.

[7]Id. at p. 269.

[8]Rec. Doc. No. 1-2, pp. 44-61.

Louisiana First Circuit affirmed the conviction and sentence, finding no merit in either issue.[9]

The Louisiana Supreme Court subsequently denied Trosclair's writ application without stated reasons on November 24, 2010.[10]  Trosclair's conviction became final 90 days later, on February 22, 2011, when he did not file a writ application with the United States Supreme Court.  Ott v. Johnson, 192 F.3d 510, 513 (5th Cir. 1999) (period for filing for certiorari with the United States Supreme Court is considered in the finality determination under 28 U.S.C. § 2244(d)(1)(A)), cert. denied, 529 U.S. 1099 (2000); U.S. Sup. Ct. Rule 13(1).

On November 18, 2011, Trosclair submitted an application for post-conviction relief to the state trial court alleging that he received ineffective assistance of counsel because his counsel failed to (a) call the victim's mother as a witness, (b) obtain the victim's criminal records, and (c) present evidence of the victim's height and weight.[11]  The state trial court denied the application on December 15, 2011, citing Strickland v.

---

[9]State v. Trosclair, 2010 WL 1253375, at *4-7; Rec. Doc. No. 1-2, pp. 17-29, 2009-KA-2002, pp. 7-13, 4/1/10.

[10]State v. Trosclair, 50 So.3d 825, 2010-KO-0974 (La. 2010); St. Rec. Vol. 3 of 4, p. 1295.

[11]Rec. Doc. No. 1-2, pp. 111-129.

Washington, 466 U.S. 668 (1984), and related state law and finding Trosclair's claims without merit.[12]

On January 9, 2012, Trosclair submitted a writ application seeking review of that ruling in the Louisiana First Circuit.[13]  On April 12, 2012, the Louisiana First Circuit denied Trosclair's writ application.[14]

On April 30, 2012, Trosclair submitted a writ application to the Louisiana Supreme Court again claiming that he received ineffective assistance of counsel.[15]  The supreme court denied the application without stated reasons on September 21, 2012.[16]

II.   FEDERAL HABEAS PETITION

On December 13, 2012, the clerk of this court filed Trosclair's petition for federal habeas corpus relief in which he asserted two grounds for relief:[17] (1) There was insufficient evidence to support his conviction because (a) the State failed to prove he was not acting in self-defense or defense of others; (b) he was too intoxicated to form the

---

[12]Id. at pp. 105-109.

[13]Id. at pp. 88-102.

[14]St. Rec. Vol. 4 of 4, 1st Cir. Order, 2012-KW-0083, 4/12/12.  The state appellate court did not consider the merits because Trosclair failed to provide the court with pertinent portions of the district court record.

[15]Rec. Doc. No. 1-2, pp. 67-83.

[16]State ex rel. Trosclair v. State, 98 So.3d 336 (La. 2012); St. Rec. Vol. 4 of4, La. S. Ct. Order, 2012-KH-1050, 9/21/12.

[17]Rec. Doc. No. 1.

requisite specific intent; (c) he should only have been convicted of manslaughter.  (2) He was denied effective assistance of counsel because his counsel failed to (a) call the victim's mother as a witness; (b) obtain the victim's criminal record; and (c) present evidence of the victim's height and weight.  The State filed a response in opposition to Trosclair's petition in which it concedes that the petition is timely and that Trosclair has exhausted his state court remedies.[18]

III.   GENERAL STANDARDS OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, comprehensively revised federal habeas corpus legislation, including 28 U.S.C. § 2254.  The AEDPA went into effect on April 24, 1996[19] and applies to habeas petitions filed after that date.  Flanagan v. Johnson, 154 F.3d 196, 198 (5th Cir. 1998) (citing Lindh v. Murphy, 521 U.S. 320 (1997)).  The AEDPA therefore applies to Trosclair's petition which, for reasons discussed below, is deemed filed in this federal court on November 29, 2012.[20]

---

[18]Rec. Doc. No. 7.

[19]The AEDPA, which was signed into law on that date, does not specify an effective date for its non-capital habeas corpus amendments. Absent legislative intent to the contrary, statutes become effective at the moment they are signed into law. United States v. Sherrod, 964 F.2d 1501, 1505 (5th Cir. 1992).

[20]The Fifth Circuit has recognized that a "mailbox rule" applies to pleadings, including habeas corpus petitions filed after the effective date of the AEDPA, submitted to federal courts by prisoners acting pro se. Under this rule, the date when prison officials receive the pleading from the inmate for delivery to the court is considered the time of filing for limitations purposes. Coleman v. Johnson, 184

The threshold questions in habeas review under the amended statute are whether the petition is timely and whether the claims raised by the petitioner were adjudicated on the merits in state court; i.e., the petitioner must have exhausted state court remedies and must not be in "procedural default" on a claim.  Nobles v. Johnson, 127 F.3d 409, 419-20 (5th Cir. 1997) (citing 28 U.S.C. § 2254(b), (c)).

The State concedes and I find that Trosclair's petition is timely filed.  The State likewise concedes and I find that Trosclair has exhausted his state court remedies.[21]

## IV.   STANDARDS OF MERITS REVIEW

28 U.S.C. §§ 2254(d)(1) and (2) contain revised standards of review for questions of fact, questions of law and mixed questions of fact and law in federal habeas corpus proceedings.  Nobles, 127 F.3d at 419-20 (citing 28 U.S.C. § 2254(b) and (c)).

Determinations of questions of fact by the state court are "presumed to be correct . . . and we will give deference to the state court's decision unless it 'was based

_____

F.3d 398, 401 (5th Cir. 1999), cert. denied, 529 U.S. 1057 (2000); Spotville v. Cain, 149 F.3d 374, 378 (5th Cir. 1998); Cooper v. Brookshire, 70 F.3d 377, 379 (5th Cir. 1995).  Trosclair dated the signature on the memorandum in support of his petition on November 29, 2012.  This is the earliest date on which he could have delivered the pleadings to prison officials for mailing.  The fact that he did not submit his filing fee to the court until December 13, 2012, does not alter the application of the federal mailbox rule to his pro se petition.  See Cousin v. Lensing, 310 F.3d 843, 847 (5th Cir. 2002) (mailbox rule applies even if inmate has not paid the filing fee at the time of mailing) (citing Spotville, 149 F.3d at 374).

[21]As the Louisiana First Circuit did not address the merits of Trosclair's ineffectiveness claim based upon a procedural deficiency, see supra at p. 7 n. 14, Trosclair arguably did not fairly present his claim to the state appellate court and, therefore, did not exhaust his state court remedies.  See Baldwin v. Reese, 541 U.S. 27, 29 (2004).  Nevertheless, because the claim is without merit, the court need not address exhaustion further.  28 U.S.C. § 2254(b)(2).

on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" <u>Hill v. Johnson</u>, 210 F.3d 481, 485 (5th Cir. 2000) (quoting 28 U.S.C. § 2254(d)(2)), <u>cert. denied</u>, 532 U.S. 1039 (2001).  The amended statute also codifies the "presumption of correctness" that attaches to state court findings of fact and the "clear and convincing evidence" burden placed on a petitioner who attempts to overcome that presumption.  28 U.S.C. § 2254(e)(1).

A state court's determination of questions of law and mixed questions of law and fact are reviewed under 28 U.S.C. § 2254(d)(1) and receive deference, unless the state court's decision "'was contrary to, or involved an unreasonable application of, clearly established [Supreme Court precedent.]'" <u>Penry v. Johnson</u>, 215 F.3d 504, 507 (5th Cir. 2000) (quoting <u>Miller v. Johnson</u>, 200 F.3d 274, 280-81 (5th Cir.), <u>cert. denied</u>, 531 U.S. 849 (2000)), <u>aff'd in part, rev'd in part on other grounds</u>, 532 U.S. 782 (2001); <u>Hill</u>, 210 F.3d at 485.  The United States Supreme Court has clarified the Section 2254(d)(1) standard as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

10

Williams v. Taylor, 529 U.S. 362, 405-06, 412-13 (2000);  Penry, 532 U.S. at 792-93;

Hill, 210 F.3d at 485.  "'A federal habeas court may not issue the writ simply because

that court concludes in its independent judgment that the state court decision applied [a

Supreme Court case] incorrectly.'"  Price v. Vincent, 538 U.S. 634, 641 (2003) (quoting

Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002)) (brackets in original); Bell v. Cone,

535 U.S. 685, 699 (2002).  Rather, under the "unreasonable application" standard, "the

only question for a federal habeas court is whether the state court's determination is

objectively unreasonable."  Neal v. Puckett, 286 F.3d 230, 246 (5th Cir. 2002), cert.

denied, sub nom, Neal v. Epps, 537 U.S. 1104 (2003). The burden is on the petitioner to

show that the state court applied the precedent to the facts of his case in an objectively

unreasonable manner.  Price, 538 U.S. at 641 (quoting Woodford, 537 U.S. at 24-25);

Wright v. Quarterman, 470 F.3d 581, 585 (5th Cir. 2006).

V.    INSUFFICIENT EVIDENCE (CLAIM NO. 1)

Trosclair alleges that the evidence was insufficient to prove that he had specific

intent to commit second degree murder because he was acting in self defense and in the

defense of others and he was too intoxicated to have the requisite intent.  Trosclair argues

that, at best, the prosecution proved only manslaughter.  His counsel asserted the same

arguments on direct appeal in the Louisiana First Circuit.  The appellate court, citing

Jackson v. Virginia, 443 U.S. 307 (1979), and related state law, found the claims without

merit, and the Louisiana Supreme Court subsequently denied relief on these grounds without stated reasons.

Under Jackson, this court must determine, after viewing the evidence in the light most favorable to the prosecution, whether a rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt. Id., 443 U.S. at 319; Perez v. Cain, 529 F.3d 588, 594 (5th Cir. 2008); Williams v. Cain, 408 Fed. Appx. 817, 821 (5th Cir. 2011). Thus, to determine whether a conviction is adequately supported by the record, the court must review the substantive elements of the crime as defined by state law. Perez, 529 F.3d at 594 (citing Jackson, 443 U. S. at 324 n. 16). The court's consideration of the sufficiency of the evidence extends only to what was presented at trial. See McDaniel v. Brown, 558 U.S. 120, __, 130 S.Ct. 665, 672, 674 (2010) (recognizing that a reviewing court must consider the trial evidence as a whole under Jackson); Johnson v. Cain, 347 Fed. Appx. 89, 91 (5th Cir. 2009) (Jackson standard relies "upon the record evidence adduced at the trial.") (quoting Jackson, 443 U.S. at 324).

Review of the sufficiency of the evidence, however, does not include review of the weight of the evidence or the credibility of the witnesses, because those determinations are the exclusive province of the jury. United States v. Young, 107 Fed. Appx. 442, 443 (5th Cir. 2004) (citing United States v. Garcia, 995 F.2d 556, 561 (5th

Cir. 1993); see Jackson, 443 U.S. at 319 (noting that it is the jury's responsibility "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts").  Thus, all credibility choices and conflicting inferences must be resolved in favor of the verdict.  Ramirez v. Dretke, 398 F.3d 691, 695 (5th Cir. 2005).

A reviewing federal habeas court is not authorized to substitute its interpretation of the evidence or its view of the credibility of witnesses in place of the fact-finder. Alexander v. McCotter, 775 F.2d 595, 598 (5th Cir. 1985).  In addition, "[t]he Jackson inquiry 'does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a rational decision to convict or acquit.'" Santellan v. Cockrell, 271 F.3d 190, 193 (5th Cir. 2001) (quoting Herrera v. Collins, 506 U.S. 390, 402 (1993)).

A claim of insufficient evidence to support a conviction presents a mixed question of law and fact.  Perez, 529 F.3d at 594; Maes v. Thomas, 46 F.3d 979, 988 (10th Cir. 1995).  Therefore, this court must examine whether the state courts' denial of relief was contrary to or an unreasonable application of United States Supreme Court precedent.

Trosclair was charged with and convicted of second degree murder, which is defined by Louisiana law as "the killing of a human being . . . when the offender has a

specific intent to kill or to inflict great bodily harm."[22]  La. Rev. Stat. § 14:30.1(A)(1).

"Specific intent" is defined as the state of mind in which the perpetrator "actively desired

the prescribed criminal consequences to follow his act or failure to act."  La. Rev. Stat.

§ 14:10(1).

Under Louisiana law, intent need not be proven directly but may be inferred from

the actions of the defendant and the circumstances surrounding those actions.  State v.

Sharlhorne, 554 So.2d 1317, 1321 (La. App. 1st Cir. 1989); State v. Tate, 851 So.2d 921,

930 (La. 2003) (citing State v. Brooks, 505 So.2d 714, 717 (La. 1987)).  Specific intent

to kill also can be implied by the intentional use of a deadly weapon, such as a knife or

gun.  State v. Collins, 43 So.3d 244, 251 (La. App. 1st Cir. 2010) (citing State v. Brunet,

674 So.2d 344, 349 (1996)).

A.      SELF-DEFENSE/DEFENSE OF OTHERS

Louisiana law provides that a homicide is justifiable when committed in self-

defense by one who reasonably believes that he is in imminent danger of losing his life

or receiving great bodily harm and that the killing is necessary to save himself from that

danger.  La. Rev. Stat. § 14:20(1).  It is justifiable to use force or violence or to kill in the

defense of another person when it is reasonably apparent that the person attacked could

have justifiably used such means himself, and when it is necessary to protect the other

---

[22]This was the definition used to charge Trosclair's jury.  St. Rec. Vol. 2 of 4, p. 749.

person.  La. Rev. Stat. § 14:22.  The State has the burden of proving that the defendant did not act in self-defense, and the standard of review on federal habeas review, in accordance with <u>Jackson</u>, is whether a rational trier of fact, after viewing the evidence in the light most favorable to the prosecution, could find beyond a reasonable doubt that the homicide was not committed in self-defense or the defense of others.  <u>State v. Lilly</u>, 552 So.2d 1036, 1039 (La. App. 1st Cir. 1989).

In this case, the state court record establishes that the evidence submitted at trial did <u>not</u> support a finding of self-defense and/or defense of others.  At least two witnesses testified that the victim had no weapon.[23]  Trosclair admitted that he did not see a weapon.[24]  Contrary to Trosclair's suggestion, there was no mob surrounding the vehicle. The area was clear, and there was no impediment to Trosclair and his companions leaving the area before trouble started.[25]  Further, there was no prolonged beating of Collins such that a reasonable person would fear for Collins's life.  As the Louisiana First Circuit observed and as the surveillance tape reflects, approximately "4 seconds elapsed

---

[23]<u>Id</u>. at pp. 842 and 895.

[24]St. Rec. Vol. 3 of 4, p. 1035.

[25]St. Rec. Vol. 2 of 4, p. 895. Record Doc. Nos. 10 and 11, Surveillance Tape 1 from trial evidence (Clear Roadway).

from the time [the victim] threw a punch until the flash of the weapon being discharged is seen."[26]

In addition, a finding that Trosclair acted in self-defense and/or to protect his friend, without specific intent to kill or inflict great bodily harm, is <u>not</u> supported by the evidence of Trosclair's actions after the shooting. Instead of remaining in the area to explain the situation to police, Trosclair and his companions fled the scene. Their vehicle sped away, running several redlights.[27] Trosclair disposed of the gun, throwing it over a bridge into the water.[28] Neither Trosclair nor any of his companions contacted police to report the matter.

I find that a rational trier of fact, after viewing this evidence in the light most favorable to the prosecution, could easily find beyond a reasonable doubt that the homicide was <u>not</u> committed in self-defense or defense of others. The state courts' rejection of Trosclair's self-defense/defense of others claim does not represent an unreasonable application of Supreme Court precedent to the facts of this case.

---

[26]<u>Trosclair</u>, 2010 WL 1253375, at *5; Record Doc. Nos. 10 and 11, Surveillance Tape 2 from trial evidence (Shot Fired).

[27]St. Rec. Vol. 2 of 4, p. 973.

[28]<u>Id</u>. at p. 883.

16

B.    <u>INTOXICATION DEFENSE</u>

Trosclair asserts that he was too intoxicated on the night of the killing to have had the specific intent to kill the victim.

The trial testimony reflects that at around 10:00 or 11:00 a.m., Trosclair went to Timmy Collins's house and both drank beer throughout the day.[29]  Collins testified that along with the beer, they smoked "weed" and took medication, "Xanbars."[30]  That night, at the club in downtown Houma where they first encountered the victim, Trosclair drank Crown Royal Whiskey, estimating that he drank two "Crown on the rocks" and three or four "shots of Crown."[31]  Later, upon driving from Collins's home, where Collins retrieved his gun, back to downtown Houma, Trosclair fell in and out of consciousness, stating that he slept "on and off," he would "pass out" then "wake up."[32]  Vivian Verret described Collins as "a little tipsy."[33]

Under Louisiana law, intoxication is a defense to a prosecution for second degree murder if the circumstances indicate the intoxication, whether voluntary or involuntary,

---

[29]<u>Id</u>. at pp. 954, 961; St. Rec. Vol. 3 of 4, pp. 1038-39.

[30]<u>Id</u>. at pp. 961-62.  The term "Xanbars" refers to a long thin pill containing the equivalent of four xanax pills. http://www.urbandictionary.com/define.php?term=xanbar. Xanax is defined as an antianxiety medication which "will add to the effects of alcohol . . . ."  http://www.pdrhealth.com/drugs/xanax.

[31]St. Rec. Vol. 3 of 4, pp. 998-99.

[32]<u>Id</u>. at p. 1038.

[33]St. Rec. Vol. 2 of 3, p. 890.

precludes the presence of specific criminal intent.  La. Rev. Stat. § 14:15(2).  When defenses that could defeat an essential element of an offense, such as intoxication, are raised by the evidence, the State must overcome the defense by evidence that proves beyond a reasonable doubt that the mental element was present despite the alleged intoxication.

The trial evidence establishes that Trosclair was clearly conscious when he grabbed Collins's gun from under the car console and shot two people, killing one. Trosclair had sufficient awareness of what he had done to attempt to dispose of key evidence of his crime by throwing the murder weapon from an overpass into the water.[34] Viewing the evidence in the light most favorable to the prosecution, the Louisiana First Circuit concluded that a rational trier of fact could conclude that Trosclair had the requisite specific intent, despite his consumption of pills and alcohol.[35]  I find that the state courts' conclusion in this regard does not represent an unreasonable application of Supreme Court precedent to the facts of this case.

---

[34]St. Rec. Vol. 2 of 4, p. 883.

[35]Trosclair, 2010 WL 1253375, at *6.

C.   <u>MANSLAUGHTER</u>

Trosclair asserts that a rational jury, viewing the evidence in a light most favorable to the prosecution, "could only have returned a verdict for the lesser included offense of manslaughter."[36]

Manslaughter is a homicide which would otherwise be a first or second degree murder, but is "committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection."  La. Rev. Stat. § 14:31(A)(1).  Under Louisiana law, however, provocation does not reduce a homicide to manslaughter if the defendant's blood had cooled or an average person's blood would have cooled.  <u>State v. Leboeuf</u>, 943 So.2d 1134, 1138 (La. App. 1st Cir. 9/15/06), <u>writ</u> <u>denied</u>, 961 So.2d 1158 (La. 2007).

"Sudden passion" and "heat of blood" are mitigating factors which tend to lessen the degree of culpability of a homicide.  A defendant has the burden of proving these mitigating factors.  Thus, as the Louisiana First Circuit observed, the issue to be resolved is "whether any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found that the mitigating factors were not established by a preponderance of the evidence."  <u>Trosclair</u>, 2010 WL 1253375, at *7 (citation omitted).

---

[36]Rec. Doc. No. 1-1, p. 25.

The state court record establishes that undisputed testimony was presented that the victim was <u>not</u> armed.[37]  Trosclair admitted that he did <u>not</u> see either the victim or the victim's companion, Samuel Pugh, Jr., also known as "Kilo," armed with a gun.[38] Trosclair, however, reached for a gun and proceeded to shoot not once, but <u>twice</u>.  There was no obstacle preventing them from leaving the scene given Trosclair's alleged fearfulness.[39]  Indeed, after Trosclair had shot and killed the victim, Trosclair and his companions quickly "drove off."[40]

Based upon the above, I find that the state courts' finding that a rational trier of fact, viewing the evidence in a light most favorable to the prosecution, could have concluded that the mitigating factors necessary to warrant a manslaughter conviction were not established, does not represent an unreasonable application of Supreme Court precedent to the facts of this case.  Trosclair is not entitled to relief on this claim.

VI.     <u>INEFFECTIVE ASSISTANCE OF COUNSEL (CLAIM NO. 2)</u>

Trosclair complains that his counsel was ineffective in failing to submit evidence showing the victim's violent character and physical attributes.  He argues that his counsel should have called the victim's mother as a witness to testify that her son had a history

---

[37]St. Rec. Vol. 2 of 4, p. 842 and 895.

[38]St. Rec. Vol. 3 of 4, p. 1035.

[39]St. Rec. Vol. 2 of 4, p. 895.

[40]St. Rec. Vol. 2 of 4, p. 934.

of violence.[41] He also argues that his counsel should have introduced the victim's criminal record, reflecting "that the victim was charged and/or convicted of various crimes of violence, including convictions for illegal drugs and alcohol-related offenses."[42] He asserts that his counsel also should have introduced evidence reflecting the victim's height and weight. Such evidence, he argues, would have shown that the victim "was a much larger person than [his] friend, Timmie [sic] Collins."[43]

The standard for judging performance of counsel was established by the United States Supreme Court in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), in which the Supreme Court established a two-part test for evaluating claims of ineffective assistance of counsel, requiring petitioner to prove both deficient performance and resulting prejudice. <u>Strickland</u>, 466 U.S. at 697 (emphasis added). The Supreme Court first held that "the defendant must show that counsel's representation fell below an objective standard of reasonableness." <u>Id</u>. at 687–88. Second, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Id</u>. at 694; <u>United States v. Kimler</u>, 167 F.3d 889, 893 (5th Cir. 1999).

---

[41]Rec. Doc. No. 1-1, p. 27.

[42]<u>Id</u>. at pp. 27-28.

[43]<u>Id</u>. at p. 28.

In deciding ineffective assistance of counsel claims, this court need not address both prongs of the conjunctive Strickland standard, but may dispose of such a claim based solely on a petitioner's failure to meet either prong of the test. Kimler, 167 F.3d at 893. A habeas corpus petitioner "need not show that 'counsel's deficient conduct more likely than not altered the outcome in the case.' It is not enough under Strickland, however, 'that the errors had some conceivable effect on the outcome of the proceeding.'" Motley v. Collins, 18 F.3d 1223, 1226 (5th Cir. 1994) (quoting Strickland, 466 U.S. at 693).

On habeas review, the United States Supreme Court has recently clarified that, under Strickland, "[t]he question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." Harrington v. Richter, ⸺ U.S. ⸺, 131 S.Ct. 770, 788 (2011). The Harrington Court went on to recognize the high level of deference owed to a state court's findings under Strickland in light of the AEDPA:

> The standards created by Strickland and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so. The Strickland standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.

"A court must indulge a 'strong presumption' that counsel's conduct falls within the wide range of reasonable professional assistance because it is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight." Bell v. Cone, 535 U.S. 685, 697 (2002) (citing Strickland, 466 U.S. at 689). A " 'conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness.'" Johnson v. Dretke, 394 F.3d 332, 337 (5th Cir. 2004) (quoting United States v. Jones, 287 F.3d 325, 331 (5th Cir. 2002)); see also Jones, 287 F.3d at 331 ("Informed strategic decisions of counsel are given a heavy measure of deference and should not be second guessed." (quotation omitted)); Geiger v. Cain, 540 F.3d 303, 309 (5th Cir. 2008) (same). Federal habeas courts presume that trial strategy is objectively reasonable unless clearly proven otherwise. Strickland, 466 U.S. at 689.

The issue of ineffective assistance of counsel is a mixed question of law and fact. Woodfox v. Cain, 609 F.3d 774, 789 (5th Cir. 2010); Richards v. Quarterman, 566 F.3d 553, 561 (5th Cir. 2009). The question before this court is whether the state courts' denial of relief was contrary to or an unreasonable application of United States Supreme Court precedent.

I find that Trosclair was not prejudiced and his counsel did not provide constitutionally ineffective assistance by failing to demonstrate the victim's violent nature through the testimony of his mother and his criminal record.  Nor did counsel err in failing to demonstrate the victim's size and strength by submitting evidence reflecting the victim's height and weight.  Ample evidence was submitted reflecting the victim's strength, size and violent nature.

Trosclair himself testified at trial about the victim's size, describing the victim as a "big, strong guy."[44]  The victim's actions, as described in other trial testimony, displayed his propensity for aggressiveness, even violence.  For example, the victim grabbed Vivian Verret's arm and called her a "ho."[45]  When she told the victim that she was going to tell her boyfriend, the victim was untroubled, responding that "he didn't care."[46]  When Collins confronted the victim, he pushed Collins with such force that Collins slid under a pool table.[47]  Later that night, when Collins returned to the area, the victim did not hesitate to approach him and aggressively taunted Collins, saying: "I know

---

[44]St. Rec. Vol. 3 of 4, p. 1040.

[45]St. Rec. Vol. 2 of 4, p. 887.

[46]Id. at p. 888.

[47]St. Rec. Vol. 2 of 4, p. 888 (Linzie Smith's testimony); p. 923 (Vivian Verret's testimony); St. Rec. Vol. 3 of 4, p. 1040 (Trosclair's testimony).

that ain't that pussy ass nigger that was in the club."[48]  Shortly thereafter, the victim

started throwing punches.[49]

     "'Complaints of uncalled witnesses are not favored, because the presentation of

testimonial evidence is a matter of trial strategy and because allegations of what a witness

would have testified are largely speculative.'"  Graves v. Cockrell, 351 F.3d 143, 156

(5th Cir. 2003) (quoting Buckelew v. United States, 575 F.2d 515, 521 (5th Cir. 1978)).

"'Failure to present [evidence does] not constitute 'deficient' performance within the

meaning of Strickland if [counsel] could have concluded, for tactical reasons, that

attempting to present such evidence would be unwise.'"  Williams v. Cockrell, 31 Fed.

Appx. 832 (5th Cir. 2002) (quoting Williams v. Cain, 125 F.3d 269, 278 (5th Cir. 1997)).

     In this case, the victim's mother's testimony regarding her son's violent nature

would have merely been cumulative.  The same is true regarding evidence of the victim's

alleged criminal history and physical attributes, i.e., his weight and height.  The fact that

the victim was a big man with a propensity for violence was brought to the jury's

attention by evidence reflected in the record.  Further evidence in this regard would have

been cumulative.  The failure to submit cumulative evidence or testimony generally does

not amount to ineffective assistance of counsel.  Richards v. Quarterman, 566 F.3d 553,

---

[48]Id. at p. 892.

[49]Id.

569 (5th Cir. 2009); <u>Coble v. Quarterman</u>, 496 F.3d 430, 436 (5th Cir. 2007) ("Counsel's decision not to present cumulative testimony does not constitute ineffective assistance.") (citing <u>Murray v. Maggio</u>, 736 F.2d 279, 282 (5th Cir. 1984).

In addition, in-depth questioning of the victim's mother would have raised the possibility that the mother would also have provided favorable testimony about her son, a phenomenon commonly expected when a mother reflects on her son. Such testimony would have been damaging to Trosclair, and his counsel was justified in making the tactical decision not to run that risk.

Under all of the foregoing circumstances, the performance of Trosclair's counsel was not constitutionally deficient. Trosclair is not entitled to federal habeas corpus relief on this ground.

## **RECOMMENDATION**

For the foregoing reasons, it is **RECOMMENDED** that the petition of Clyde Matthew Trosclair for issuance of a writ of habeas corpus under 28 U.S.C. § 2254 be **DENIED** and **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and

legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  <u>Douglass v. United Servs. Auto. Ass'n</u>, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc) (citing 28 U.S.C. § 636(b)(1)).[50]

New Orleans, Louisiana, this ____10th____ day of May, 2013.

_____
JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE

---

[50]<u>Douglass</u> referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.